**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER WOODARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:20-cv-00148** |
| **CITY OF MURFREESBORO,** | ) | **Judge Aleta A. Trauger** |
| **CITY MANAGER CRAIG TINDALL, in** | ) | |
| **his official capacity and individually,** | ) | |
| **CHIEF OF POLICE MICHAEL** | ) | |
| **BOWEN, in his official capacity and** | ) | |
| **individually, and SGT. MARJA** | ) | |
| **ATCHLEY, in her official capacity and** | ) | |
| **individual,** | ) | |
| | ) | |
| **Defendants.** | | |

## MEMORANDUM

Before the court are two Motions to Dismiss, the first (Doc. No. 25) filed by defendant Marja Atchley, seeking dismissal of the claims asserted against her in her individual capacity, and the second (Doc. No. 30) filed on behalf of the remaining defendants: City of Murfreesboro, City Manager Craig Tindall in both his official and individual capacities, Chief of Police Michael Bowen in his official and individual capacities, and Atchley in her official capacity (collectively referred to herein as "the City Defendants"). For the reasons set forth herein, both motions will be granted, and this case will be dismissed in its entirety.

## I.      FACTUAL BACKGROUND

The sixty-eight page Complaint and the thirty-nine exhibits attached thereto together lay

out in exhaustive detail the facts supporting the plaintiff's claims.[1] The court summarizes the relevant facts as gleaned from those documents.

The plaintiff was employed as a police officer with the City of Murfreesboro Police Department ("MPD") from May 2011 until his termination in August 2019. His immediate supervisor, at all relevant times, was defendant Atchley, a sergeant with the MPD. Defendant Bowen was at all relevant times the MPD Chief of Police, and defendant Tindall was Murfreesboro's City Manager. Atchley had an "ongoing pattern and practice of abusing her supervisory position as a Sergeant by intentionally bullying MPD employees under her supervision, taking unjustified, punitive actions against MPD employees, and making groundless, harmful, false accusations against other MPD employees, resulting in discipline or threats of discipline to those employees." (Doc. No. 1 ¶ 28.)

Woodard worked the night shift as a patrol officer. On the early morning of July 25, 2018, while patrolling within his assigned zone in the City of Murfreesboro, he saw flashing blue lights in a gas station parking lot. Pursuant to MPD's standard operating procedure and General Order No. 104, II, J, Woodard drove to that location to assist. Upon arrival, he observed that a Tennessee Highway Patrol ("THP") Trooper, Joey Story, had four individuals detained and sitting on a sidewalk. A Rutherford County Deputy Sheriff ("Deputy") was also on the scene, and his vehicle was pulled up beside Story's. Woodard knew Story as a "friendly work acquaintance." (*Id.* ¶ 38.) Because the sightline from his vehicle was blocked by the vehicles of Story and the Deputy, Woodard did not turn on his patrol car's AV (audio-visual) recorder when he stopped. Woodard realized, based on the number of individuals detained and the fact that some were juveniles, that

---

[1] All parties agreed that the attached exhibits could be used in briefing on the pending Motions to Dismiss.

Story would need assistance, so he properly stayed on the scene for approximately sixty-five minutes to provide such assistance.

Based on standard operating procedures and protocols, because Story was the officer who initiated the stop, Story should have been the law enforcement officer who would make any necessary arrests and take into custody any individuals who needed to be taken into custody. Story, however, suggested to Woodard that he take one of the detained individuals—a juvenile runaway—into custody. Woodard, pursuant to standard operating procedures, refused. This conversation was not captured on Story's AV recorder. Woodard, however, states that the "AV recording reflects that the Trooper's body audio on the AV recordings clicked 'off' for several seconds," and it was during this "audio silence" that Story "suggested that Plaintiff take the juvenile runaway into custody" and that the plaintiff refused. (*Id.* ¶¶ 47–48 & n.17.)

Because the other detained individuals had been released to their parents and it was by this time around 4:30 a.m., the customary time for his meal break, Woodard advised Story and MPD dispatcher Randi Hall that he was leaving to take his meal break. During his telephone conversation with Hall, Woodard also learned that Story had instructed THP dispatch to call MPD dispatch to request that MPD send another officer to take custody of the juvenile runaway and that MPD dispatch had sent Woodard's zone partner, Officer Richard Whitley, to the scene.

Woodard had been "annoyed" that Story had asked him to take custody of the juvenile runaway and was even more annoyed that Story had then gone behind him to get another MPD officer to the scene to take custody of the juvenile. (Doc. No. 1 ¶ 51.) Despite having already told dispatch that he was on his meal break, Woodard stayed on the scene until Whitley arrived. He advised Whitley that he should not take the juvenile runaway into custody either, because Story was the officer who had initiated the traffic stop. Whitley later claimed not to recall this exchange.

(Aug. 19, 2019 Hr'g Tr. 106, Doc. No. 1-37, at 29.) Regardless, Woodard then left and returned to the MPD "roll-call room" to take the remainder of his meal break, arriving at the MPD headquarters around 4:55 a.m.

Shortly thereafter, defendant Atchley overheard parts of Woodard's conversation with other officers in the roll-call room and immediately jumped to several incorrect conclusions, including that Woodard had taken an overly long meal break and that he had acted improperly during his stop to assist Story. Atchley then demanded that Woodard accompany her to the open "Sergeants' area," where she spent an excessively long time loudly berating Woodard, inappropriately and without justification, asking him questions and then refusing to give him the opportunity to answer them. Her "tongue-lashing" went on for so long that Lt. Tom Sissom, commanding officer of the night shift, told her to end it and later directed Atchley to apologize to Woodard. (Doc. No. 1 ¶¶ 59–63.)

Woodard attempted to truthfully relay to Atchley what had happened during the stop, but she repeatedly called him a liar and cut him off. Atchley later spoke with dispatcher Hall, who confirmed Woodard's version of events, specifically that Story had directed the THP's dispatch to contact MPD's dispatch to request that an MPD officer come take custody of the juvenile runaway, and that Woodard had nothing to do with it. Despite Hall's corroboration, Atchley continued to mischaracterize the July 25, 2018 "stop" and to spread untrue allegations about the plaintiff throughout the MPD. Atchley called Sgt. Scotty Miller of the THP to criticize both Story and Woodard and to communicate "her 'opinions' and 'beliefs' about the Plaintiff's 'dishonesty'" (Doc. No. 1 ¶ 70.) She also "publicly," "within the hearing of others," expressed her unfounded conclusions about Woodard's honesty and his behavior during the July 25, 2018 stop, specifically making false and defamatory statements about the plaintiff while Atchley was drinking at a bar.

(Doc. No. 1 ¶ 72.)

On August 21, 2018, Atchley initiated an MPD "Blue Team Complaint" against Woodard in which she blatantly mischaracterized her hostile interrogation of Woodard on the morning of July 25, 2018 as a "10-minute chat," misrepresented what he had told her during that conversation, and falsely reported that: he had been dishonest with her about the stop and whether his AV recorder was on; his story changed; he was not disclosing the whole story; he had been improperly "hanging out" or "loafing" at the stop; Story was his "friend" rather than merely an acquaintance; he had taken excessive time for his meal break in violation of the meal break policy; he had "offered" to Story to have Whitley come to the scene and take the juvenile runaway into custody, thus "throwing his zone partner under the bus"; and he had engaged in "horseplay" during the stop, in violation of MPD's code of ethics. (Doc. No. 1 ¶¶ 73–74, 76, 80.) Atchley's primary complaints were that Woodard had been "dishonest and untruthful concerning his 'inattention to duties' and 'loafing.'" (*Id.* ¶ 80.)

Lt. Steve Jarrell was assigned by the MPD Office of Professional Responsibility ("OPR") to investigate Atchley's allegations in the Blue Team Complaint. In the course of his investigation, Jarrell interviewed Atchley, Whitley, Officer Eatmon[2] (a recruit who was with Whitley the night in question), and the plaintiff, but he did not interview dispatcher Randi Hall. The plaintiff also asserts that Jarrell "could not have carefully and thoroughly reviewed the entire two hours and 58 minutes of AV recordings at issue," because his report contains "clear errors" that contradict the AV recordings. (Doc. No. 1 ¶ 88.) In his report, although Jarrell rejected Atchley's accusation that Woodard had engaged in "horseplay" and found several other "factual 'errors'" in Atchley's

---

[2] This individual is sometimes referred to in the record as Cordario Eatmon (Doc. No. 1 ¶¶ 52, 81) and at other times as Eatmon Cordario (*id.* ¶ 119). The record indicates that his name is Cordario (or Corario, *see* Doc. No. 1-14) Eatmon.

statement, he otherwise, according to Woodard, largely "rubber-stamped" Atchley's false allegations that Woodard had been untruthful in relaying to her what had occurred during the July 25, 2018 stop. (Doc. No. 1 ¶¶ 82, 90, 94; *see also* Jarrell OPR Report, Doc. No. 1-20.)

Ultimately, in the OPR Investigation report submitted to Police Chief Michael Bowen on September 24, 2018, Jarrell made findings that Woodard had violated the MPD's General Order 104, section C, "Police Code of Conduct – Every officer shall deal truthfully and honorably with others" (Doc. No. 1-20, at 13) by: (1) telling Atchley that he had searched the passenger side of the vehicle stopped by Story, but later admitted he just "looked" in it; (2) telling Atchley that "he spoke to the juvenile[ runaway]'s mother and learned he was given a false name, yet it was actually Trooper Story who learned the juvenile's real name"; (3) telling dispatch he was on meal break when he was actually still on the scene of the stop; (4) intentionally gave the impression to dispatch, by using verbs in the past tense, that he had left the scene when he was actually still there; (5) stating that Story had tried to convince him to take the juvenile into custody and he had refused because it was not his arrest, which Jarrell concluded was not corroborated by Story's AV recording; (6) claiming he did not know Story had called MPD dispatch to request another unit to transfer the juvenile; and (7) claiming he told dispatch not to send another unit and then told them that he saw Whitley and Eamon pull into the parking lot and he would take care of it, which is not confirmed by the recording of his conversation with dispatch. (Doc. No. 1-20, at 13, 14.) Jarrell specifically concluded that (1) Woodard did not want to take custody of the juvenile and requested his meal break "so he would not be dispatched" and by trying to leave the scene before his zone partner arrived, and was thus "neglectful of his duties" and "put the responsibilities on his zone partner"; and (2) at the same time, neglected patrolling his zone by staying on the scene longer than necessary. (*Id.* at 14.)

Jarrell submitted his report to defendant Bowen. Chief Bowen, "without further investigation into the false allegations" against Woodard, "rubber-stamped" Jarrell's OPR report and "[s]ustained [the report] for violations." (Doc. No. 1 ¶ 94; Doc. No. 1-20, at 14.) Lt. Allen Cox and Major David Hudgins also accepted Jarrell's report without further inquiry and recommended to Bowen that Woodard be suspended for five days. (Doc. No. 1 ¶ 96; Doc. No. 1-21.) Captain Alan Smith did not agree with this recommendation and, instead, based on a disciplinary action taken against the plaintiff in 2015, recommended that the plaintiff be placed on disciplinary probation for a year in addition to the five-day suspension. (Doc. No. 1 ¶ 98, Doc. No. 1-21.) Meanwhile, throughout the investigation and review, Atchley had been lobbying for more severe sanctions. (Doc. No. 1 ¶ 99.)

The plaintiff was "incredulous" and upset about Jarrell's findings and the recommended discipline, because he did nothing wrong and the entire complaint against him was fabricated upon Atchley's lies. (Doc. No. 1 ¶¶ 100–01.) Nor did he understand why the MPD's higher-level officers continued to turn a "blind eye" to Atchley's vicious and unethical behavior against him as well as others. (Id. ¶ 102.) He was particularly upset because being placed on probation for a year would have had the effect of returning him to at-will employment status and stripping him of any right to a due process hearing if any other disciplinary action were taken against him during the probationary period. (Doc. No. 1 ¶ 103.)

Pursuant to long established municipal policy, the plaintiff had three options for responding to the Recommended Disciplinary Action Memo: (1) accept it; (2) disagree with the recommended final disposition and request a hearing before the Chief or Deputy Chief; or (3) disagree with the recommended final disposition and request a hearing before the Murfreesboro Police Disciplinary Review Board (MPDRB). The plaintiff selected the second option, requesting a hearing before the

"Chief and/or Deputy Chief." (Doc. No. 1 ¶¶ 104, 105; Doc. No. 1-24.) Chief Bowen, however, declined to hear Woodard's appeal and "instead took the unusual step of 'punting' Plaintiff's request for review" to the MPDRB. (Doc. No. 1 ¶ 106.) Woodard alleges that, by refusing to hear his appeal, Bowen failed to perform his job in accordance with long-standing policy and the written job description for the Chief of Police and, thus, "knowingly, intentionally, willfully, and with reckless disregard for Plaintiff's constitutional and legal rights, *refused to perform an essential function of his job* to hear Officer Woodard's appeal of the recommended 'discipline.'" (Doc. No. 1 ¶ 108.) Despite knowing that Atchley was a "loose cannon" with a history of losing her temper, bullying officers under her supervision, falsely and maliciously accusing officers of misconduct, and using her position in a punitive fashion, Bowen "elected to violate policy" by sending the plaintiff's appeal to the MPDRB instead of hearing it himself. (*Id.* ¶ 109.)

The plaintiff's hearing before the MPDRB took place on March 13, 2019. The MPDRB was comprised of two captains, two sergeants, two police officers, and one detective, all of whom the plaintiff claims had "made up their minds about [the] case prior to the hearing [and] based upon prejudicial pre-hearing communications" from Atchley and other members of the MPD. (Doc. No. 1 ¶ 114.) At this hearing, although the plaintiff could request that certain witnesses be called, the MPDRB had complete control over who appeared as witnesses and no obligation to call Woodard's designated witnesses. In addition, the Rules of Civil Procedure and Evidence did not apply, so the MPDRB was permitted to hear and consider hearsay, opinions, and speculation in place of actual evidence. At this hearing, the plaintiff claims, Atchley lied under oath.

The plaintiff was represented by counsel at the hearing,[3] and his attorney requested, in advance, to present three witnesses on behalf of the plaintiff: dispatcher Randi Hall, Officer

---

[3] His counsel at this point was Blake Garner.

Whitley, and Officer Eatmon. The City agreed to make these witnesses available at the hearing, but none appeared, and the plaintiff later learned that the City had never notified these witnesses or called them to be present the day of the hearing. At the hearing, plaintiff's counsel was placed in the untenable position of either "angering and antagonizing MPDRB members by insisting on continuing the hearing . . . or reluctantly agreeing to go forward without Plaintiff's witnesses," either of which prejudiced the plaintiff. (Doc. No. 1, at 34 n.39.) The attorney chose to proceed with the hearing. (*Id.*)

Although the plaintiff was unable to call all the witnesses he would have liked, his attorney cross-examined the City's witnesses, and the plaintiff himself testified and gave his side of the story. In addition, Lt. Alan Cox testified favorably that Woodard had always been truthful to him. Lt. Jarrell, on cross-examination, admitted that it would have been inappropriate for Woodard to take the juvenile into custody and also corrected several of the inaccurate findings in his earlier report, including acknowledging that the plaintiff had actually spoken to the juvenile runaway's mother, had not been on the scene for much more than an hour, and did not know that Whitley had already been dispatched to the scene at the time he requested his meal break, and that it actually was Trooper Story who had THP dispatch call MPD dispatch to send another MPD officer to the scene.

The plaintiff claims that the members of the MPDRB, however, had collectively made up their minds prior to the hearing and accepted Atchley's false accusations wholesale. Two days after the hearing, the Chair of the MPDRB sent a two-page Memorandum to Bowen recommending that Woodard be terminated based on a pattern of untruthfulness. (Doc. No. 1 ¶ 131; Doc. No. 1-25.) Seven days later, Bowen notified the plaintiff in writing of this proposed termination and that he concurred with the findings and recommendation by the MPDRB. He also notified the plaintiff

that he was forwarding his recommendation to "City Manager Craig Tindall for his consideration." (Doc. No. 1 ¶ 140; Doc. No. 1-26.)

The plaintiff alleges that Atchley's misconduct, as described in the Complaint, is a "matter of public concern." (Doc. No. 1 ¶ 134.) He also asserts that Bowen's refusal to hear the appeal himself, in the first instance, and his act of "rubber-stamping" the MPDRB's decision to terminate Woodard (rather than conducting a thorough review of the record himself) violated established policy, the City Charter, and the plaintiff's constitutional rights. (*Id.* ¶¶ 141,149.)

As soon as Bowen issued his recommendation that Woodard's employment be terminated, the City immediately decommissioned him, requiring him to surrender his badge and service weapon, and assigned him to perform clerical work while wearing "plain clothes." (Doc. No. 1 ¶ 153.) The plaintiff asserts that being decommissioned and required to work the daytime shift doing clerical work constituted an adverse employment action, because he immediately lost overtime wages and suffered further financial hardship as a result of being required to work the day shift, which, because his wife also worked during the day, put him and his wife in the position of having to pay for child care. (Doc. No. 1 ¶ 151.) In addition, anyone who walked into the MPD who saw Woodard out of uniform and doing clerical work would immediately know he had been decommissioned, a punishment generally reserved for officers who have engaged in "egregious misconduct." (Doc. No. 1 ¶ 153.)

The plaintiff also alleges that the City of Murfreesboro, through its agents, informed the District Attorney and Assistant District Attorneys for the City that he had been decommissioned on the basis of dishonesty. "Based upon the false and stigmatizing information about Plaintiff given" them, the DA's office "did not want Officer Woodard to serve as the prosecution's witness at upcoming hearings and trials." (Doc. No. 1 ¶ 156.) In addition, other MPD employees told

numerous city employees, third parties, and MPD retirees "about the hearing and related stigmatizing, false information" about Woodard, while Atchley "bragged" that she had "gotten rid of" Woodard. (Doc. No. 1 ¶ 155.)

Defendant Tindall sent Woodard a letter dated March 31, 2019, notifying him that he intended to accept Bowen's recommendation of termination but that Woodard had "a right to request a due process hearing before this disciplinary measure takes effect." (Doc. No. 1-27.) If Woodard requested such a hearing, he would have a right to be represented by an attorney and to present witnesses and exhibits. (*Id.*) Woodard immediately submitted to Tindall a "Motion to Set Aside [the MPDRB's] Recommendation to City Manager Tindall, and Request for New Hearing."[4] (Doc. No. 1-28.) By letter dated April 30, 2019, Tindall notified plaintiff's counsel that the motion was not "ripe," because the MPDRB "is an advisory body making a recommendation to the Police Chief, not the City Manager," but he also advised the plaintiff that the issues raised in the motion "can be presented and, if presented, will be considered at the hearing" before the City Manager. (Doc. No. 1-29.)

On June 13, 2019, plaintiff's counsel sent an email to the Murfreesboro City Attorney, notifying her that Woodard was requesting a "'name clearing hearing' pursuant to the 14th Amendment of the U.S. Constitution (Sec. 1983) and the Tennessee Constitution." (Doc. No. 1-30.) Counsel for the plaintiff then sent a letter to the City Manager, dated June 20, 2019, which, among other matters, demanded a "'Clear Your Name' hearing to refute any inaccurate suggestions of 'dishonesty' or 'violations' of the MPD Code of Conduct arising from the July 25, 2018 traffic stop." (Doc. No. 1-31.) The plaintiff asserts, as a legal matter, that a "name clearing

---

[4] By this time, the plaintiff was represented by both Blake Garner, his original counsel, and Joyce Grimes Safley, his current attorney. (*See* Doc. No. 1-28, at 4.)

hearing" is "required as a 'pre-deprivation hearing.'" (Doc. No. 1 ¶ 165.) He asserts that the City Manager and the City of Murfreesboro repeatedly denied his request for a name-clearing hearing on the grounds that the request was not "ripe." (Doc. No. 1 ¶ 165; *see also* June 21, 2019 email from Tindall to Safley, Doc. No. 1-33 (noting that a "name-clearing hearing . . . is not appropriate at this stage").)

The plaintiff, meanwhile, requested to depose Atchley in anticipation of the due process hearing before Tindall. The City of Murfreesboro initially agreed to produce her for deposition and then reneged on that agreement and refused to allow her to be deposed. (Doc. No. 1 ¶ 167; *see also* Doc. No. 1-31.) Tindall denied the plaintiff's motion to compel Atchley's deposition as without "any procedural basis." (Doc. No. 1 ¶ 172; *see also* Doc. No. 1-33.) The plaintiff asserts that he was prejudiced in participating in the due process hearing as a result of not being permitted to depose Atchley. He also claims that Tindall's refusal to require the City to respond to his motion confirmed that Woodard "would not receive a fair hearing before him" and that Tindall had "already predetermined the outcome of the case." (Doc No. 1 ¶ 171.) Woodard also believes that the language of Tindall's June 21, 2019 email demonstrated his bias against the plaintiff, insofar as it notified him that a "name-clearing hearing [was] not appropriate at this stage," that no other procedural motions were warranted, that the proceeding to be conducted before him would not be a *de novo* hearing, that the plaintiff's presentation should be limited to rebuttal or mitigating matter only, and that he would only have ninety minutes to make his presentation. (*Id.* ¶ 173; *see also* Doc. No. 1-33.) The plaintiff maintains that Tindall's actions, in particular his refusal to hold a name-clearing hearing or allow the plaintiff to submit proposed findings of fact and conclusions of law, violated the City Charter and the plaintiff's due process rights.

Because his presentation was limited to ninety minutes, the plaintiff was "forced to speed

through the examinations of witnesses and did not have time to thoroughly and adequately present [his] case." (Doc. No. 1 ¶ 182.) Atchley again testified falsely under oath, but the plaintiff's attorney was able to impeach her testimony and show that it was false. (*Id.* ¶¶ 183, 185.) Although it was "abundantly clear to all in attendance" that Atchley had fabricated her accusations against Woodard, Tindall concluded that "[n]othing presented at the hearing demonstrated an error in the Department's investigation or the [MPDRB's] determination." (*Id.* ¶ 190.) He accepted the recommendation that the plaintiff's employment be terminated without making a full review of the record.

The plaintiff asserts that Tindall and Bowen, in their official capacity, have "developed and employ a *de facto* policy and practice . . . of failing and refusing to properly investigate Defendant Atchley's false accusations against other police officers," despite knowing that her accusations are false (Doc. No. 1 ¶ 196); have "routinely" placed false information generated by Atchley into police employees' personnel files, including that of Woodard; and have taken adverse employment actions against such employees, including Woodard, on the basis of false information created by Atchley (*id.* ¶ 197). The defendants have "informed *third parties*, i.e., 'the public,' of false allegations against MPD employees, *including the Plaintiff*, that were fabricated by Defendant Atchley." (*Id.* ¶ 198.)

The plaintiff alleges that defendant Atchley continued to retaliate against him even after his employment had been terminated. Specifically, in October 2019, she falsely accused Woodard of impersonating a police officer and reported her accusations to Bowen, Tindall, and City Attorney Adam Tucker. She also referred her complaint to OPR Investigator Jarrell to pursue it further. The plaintiff claims that she knowingly and falsely accused him of impersonating a police officer for the purpose of retaliating against him and causing him further harm. Jarrell refused to

investigate the accusation, as Woodard was no longer an MPD employee, and referred the complaint to Lt. Tom Sissom. Sissom closed the investigation after concluding that there was no evidence to support Atchley's allegations. The plaintiff nonetheless alleges that the City of Murfreesboro, Bowen, and Tindall knew about Atchley's complaint and "participated" in Atchley's retaliation by continuing in their pattern and *de facto* policy of "accepting false and untruthful accusations made by Defendant Atchley," turning a blind eye to her misconduct, and taking no corrective action against her. (Doc. No. 1 ¶ 212.) The plaintiff further alleges that Atchley abused her position by casting him in a false light and making disparaging remarks against him to a third-party (his neighbor). The defendants never contacted his neighbor to inform her that Atchley's complaint against him was false, thus further damaging his reputation.

## II.   PROCEDURAL HISTORY

The plaintiff filed suit on February 20, 2020. In his Complaint, he asserts three distinct claims for relief, or "counts," against all the defendants, without distinguishing among them, under 42 U.S.C. § 1983: (1) a claim based on the defendants' depriving the plaintiff of his protected property interest in continued employment with the City of Murfreesboro without due process; (2) a claim based on the defendants' depriving the plaintiff of a liberty interest protected by the Fourteenth Amendment, specifically an interest in his reputation, honor, good name, and integrity, without due process; and (3) a claim for retaliation against the plaintiff for having exercised his right to petition the City of Murfreesboro for redress of grievances, in violation of the First Amendment. In addition to monetary damages for injuries arising from those alleged constitutional violations, the plaintiff also seeks injunctive relief and punitive damages.

The plaintiff filed a Motion for Preliminary Injunction on April 20, 2020, which remains pending. Shortly thereafter, defendant Atchley and the City Defendants filed their separate Motions to Dismiss and supporting Memoranda (Doc. Nos. 25, 26, 30, 31). Citing Rule 12(b)(6)

of the Federal Rules of Civil Procedure, the defendants seek dismissal of all claims asserted against them on the grounds that the allegations in the Complaint, even presumed to be true and construed in the light most favorable to the plaintiff, fail to state a claim for which relief may be granted under 42 U.S.C. § 1983. After having been granted leave to exceed the page limitations imposed by the court's Local Rules, the plaintiff has filed Responses in opposition to both Motions to Dismiss. (Doc. Nos. 39, 40.) The defendants thereafter filed Replies (Doc. Nos. 42, 43). The plaintiff, without leave of court, filed a Surreply, in which he distinguishes his case from that of *Miller v. City of Murfreesboro*, 122 S.W.3d 766 (Tenn. Ct. App. 2003), on which Atchley relies in support of her argument that the plaintiff did not have a constitutionally protectible property interest in his employment. (Doc. No. 44.) On June 17, 2020, the court granted Atchley leave to file a Notice of Supplemental Authority (Doc. No. 48), bringing to the court's attention a recent Tennessee Supreme Court decision, *Keller v. Casteel*, No. E2017-01020-SC-R11-CV, --- S.W.3d ---, 2020 WL 3118602 (Tenn. June 12, 2020).

## III.  STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## IV.    DISCUSSION

All of the plaintiff's claims for relief arise under 42 U.S.C. § 1983. Generally, to state a claim for relief under § 1983, a plaintiff must allege (1) "the deprivation of a right secured by the Constitution or laws of the United States" and (2) that "the deprivation was caused by a person acting under color of state law." *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003) (citation omitted). To state a claim under § 1983 against a municipality, or against municipal officials in their official capacity,[5] the court must consider, not only "[w]hether the plaintiff has asserted the deprivation of a constitutional right at all," but also "[w]hether the [municipality] is responsible for that violation." *Id.* at 505–06. Allegations that an unconstitutional action was taken by officials with "final decision making authority" may satisfy the second inquiry. *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016).

---

[5] A suit against an official in his official capacity "is treated as a suit against the municipality." *Doe v. Claiborne Cty.*, 103 F.3d 495, 509 (6th Cir. 1996). Consequently, the claims against the natural-person defendants in their official capacities are redundant of the claims against the City of Murfreesboro.

**A.      Count One: Whether the Plaintiff Was Deprived of a Constitutionally Protected Property Interest Without Due Process**

In support of her motion to dismiss this claim, Atchley argues that the plaintiff cannot establish the violation of a constitutional right in the first instance, both because Woodard did not have a constitutionally protected property interest in his employment with the City of Murfreesboro and because, even if he did, he was accorded all the process that was due under the Constitution. (Doc. No. 26.) The City Defendants presume, for purposes of their Motion to Dismiss only, that the plaintiff had a constitutionally protected property interest in his employment, but, like Atchley, they contend that the plaintiff was accorded all of the predeprivation process to which he was due.

*1.      The Existence of a Property Interest*

The City of Murfreesboro's Employee Handbook, relevant excerpts of which are attached as exhibits to the Complaint, establishes a mandatory procedure that all municipal agencies must make available to non-probationary employees before subjecting them to any form of serious discipline. For instance, if a "department or section head or designee" believes an employee should be subject to more than three days of suspension without pay or to disciplinary probation, "then the employee shall be given written notice of the charges and the proposed discipline, an explanation of the City's evidence, and an opportunity to present the employee's side of the story before the proposed disciplinary action takes effect." (Doc. No. 1-7, City of Murfreesboro Employee Handbook § 3002(e)(3)(i).) The purpose of this "notice and opportunity to be heard is . . . to prevent disciplinary determinations based on mistakes in facts by requiring the decision-maker to be certain that there are reasonable grounds to support the proposed action." (*Id.*) If, following that initial proceeding, "the department or section head . . . determines that termination . . . is the most appropriate discipline," as happened here, "the department or section head . . . shall

make that recommendation in writing to the City Manager and the matter shall proceed with a due process hearing." (*Id.* § 3002(e)(3)(iii).) Thereafter, "[a] due process hearing shall be held before the City Manager . . . . The due process hearing before the City Manager shall be conducted in accordance with the evidentiary rules generally applicable to administrative hearings. Decisions shall be based upon a preponderance of the evidence." (*Id.* § 3002(f)(2).) The City Manager is granted the "exclusive power" to dismiss a municipal employee, "subject to the employee's constitutional rights." (*Id.* § 3002(d).)

The use of the word "shall" in multiple places, along with references to "due process" and employees' "constitutional rights," in the description of this procedure constitutes "unequivocal language demonstrating the City's intent to be bound by the handbook's provisions." *Freeze v. City of Decherd*, 753 F.3d 661, 666 (6th Cir. 2014); *see id.* ("As a general matter, a wide variety of courts have held that the use of the terms 'shall' or 'will' creates a binding obligation."). It also appears to distinguish this case on the facts from that of the plaintiff in *Keller v. Casteel*, in which the Tennessee Supreme Court recently held that a firefighter in Cleveland, Tennessee had no property interest in his employment, based on the language of the City of Cleveland personnel manual. *See Keller*, 2020 WL 3118602, at *8–9 (holding that the City of Cleveland manual did not create a contract or give rise to a property interest in municipal employment).

Based on the allegations in the Complaint as well as the disciplinary procedures established by the Employee Handbook that must be satisfied before a non-probationary employee can be terminated, the court concludes that the plaintiff adequately alleges that he had a reasonable expectation that his employment could not be terminated without cause, as determined through implementing the procedure set out in the Employee Handbook. Consequently, for purposes of the Motions to Dismiss only, the court concludes that the plaintiff adequately alleges the existence of

a constitutionally protected property interest in maintaining his employment. *Accord Gregory v. Hunt*, 24 F.3d 781, 785 (6th Cir. 1994) ("An at-will public employee does not have a property interest in continued employment unless it can be shown that the employee had a reasonable expectation that termination would be only for good cause."); *see also Freeze*, 753 F.3d at 665–66 ("[I]n order for a handbook or manual to create . . . a property right to termination only for good cause[,] the handbook must contain[ ] unequivocal language demonstrating [the employer's] intent to be bound by the handbook's provisions." (citation and internal quotation marks omitted)).

2. *What Process Was Due?*

Having concluded, for purposes of the Motions to Dismiss, that the plaintiff had a constitutionally protected property interest in continued employment with the police department, the court must consider what process was due and whether it was accorded.

"When a plaintiff has a protected property interest, a predeprivation hearing of some sort is generally required to satisfy the dictates of due process." *Leary v. Daeschner*, 228 F.3d 729, 742 (6th Cir. 2000) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)). The predeprivation hearing does not necessarily have to be elaborate, and the amount of process due depends, "in part, on the importance of the interests at stake." *Id.* Specifically in the context of a plaintiff's claim of a property interest in continued public employment, the Supreme Court has held that, in determining what type of predeprivation process is required, the district court must "balance 'the private interest in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous' decision." *Id.* at 743 (quoting *Loudermill*, 470 U.S. at 542–43); *see id.* ("Due process is a flexible principle whose requirements depend on the facts of the individual case.").

Upon balancing those factors, the Supreme Court concluded that, when a public employee is threatened with the loss of employment in which he has a protected property interest, the

individual is entitled, at a minimum, to predeprivation "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546. Thus, while a "pretermination 'hearing' [is] necessary," "something less than a full evidentiary hearing is sufficient prior to adverse administrative action." *Id.* at 545 (internal quotation marks and citation omitted). Moreover, the pretermination hearing "need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46. The Court concluded that "[t]o require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.* at 546.

The Supreme Court's conclusion in *Loudermill* that predeprivation procedure need not be elaborate depended in part on the fact that the civil servant in that case was also entitled, under state law, to "a full post-termination hearing." *Loudermill*, 470 U.S. at 546; *see id.* at 547–48 ("We conclude that all the process that is due is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures as provided by the Ohio statute."). The Sixth Circuit, too, has recognized that a relatively limited pretermination hearing, even one conducted by a biased decisionmaker, does not violate due process if the state's procedures also permit him a full-blown post-termination evidentiary hearing. *Duchesne v. Williams*, 849 F.2d 1004, 1008 (6th Cir. 1988). As the court stated in *Duchesne*:

> The full, post-termination, adversary, trial-type hearing will serve to ferret out bias, pretext, deception and corruption by the employer in discharging the employee. The adversary processes employed in an adjudicatory, post-termination hearing controlled by an impartial judge lend themselves to proving wrongful conduct by the employer. The limited, "right-of-reply" pretermination hearing, as defined in *Loudermill*, is designed to invoke the employer's discretion, his sense of fairness

and mutual respect, his willingness to reconsider. It is not designed or well-adapted
to uncover the employer's bias or corrupt motivation.

*Id.* (citation and internal quotation marks omitted). Largely for that reason, the court held that a

discharged employee is not entitled to a pretermination hearing before a "neutral and impartial

decisionmaker." *Id.* at 1006.

In this case, following Officer Jarrell's investigation into Atchley's allegations, Chief

Bowen accepted the recommendation that Woodard be suspended without pay for five days and

be placed on administrative probation for a year. Woodard appealed and was afforded an initial

hearing before the MPDRB, which lasted almost four hours.[6] At this hearing, which took place

before two captains, two sergeants, two police officers, and one detective, the plaintiff was

represented by counsel and was permitted to present evidence and witnesses. Atchley and Jarrell

testified, were cross-examined by plaintiff's counsel, and were also questioned by members of the

Board. Lt. Cox and Captain Smith, the officers who recommended or signed off on the proposed

discipline, also testified briefly, as did Lt. Sissom. There was some discussion of the fact that Randi

Hall, Whitley and Eatmon were supposed to have been present to testify but did not appear and

may not have been notified. Although the plaintiff argues that he was prejudiced by the City's

failure to ensure the presence of these witnesses, plaintiff's counsel did not formally object to their

absence, and the record indicates that everyone agreed to proceed without them. (Doc. No. 1-24,

at 34 (Tr. 95).) The plaintiff himself testified at length to present his side of the story.

Following this hearing, the MPDRB recommended that the plaintiff's employment be

terminated, and the plaintiff appealed that determination to the City Manager, who conducted a

---

[6] His claim that the chief violated policy—and violated his constitutional rights—by
refusing to conduct the hearing himself and instead referring it to the MPDRB is baseless. Even if
the chief arguably violated municipal policy, a matter the court does not resolve, the plaintiff does
not deny that the MPDRB afforded him a hearing.

second hearing. This hearing was limited to three hours in length, with the plaintiff's presentation limited to ninety minutes, and the City Manager made it clear that his review was not *de novo*. Instead, as he announced at the outset, the purpose of the hearing was to give the plaintiff the opportunity to establish that the prior decision "was sufficiently in error for [the City Manager] to alter or overturn the decisions that have been made." (Doc. No. 1-37, at 2 (Tr. 4).) Nonetheless, the plaintiff, once again, was represented by counsel and was permitted to call witnesses, introduce evidence, and present his side of the story.

Two days after the hearing before him, City Manager Tindall sent Woodard a letter notifying him that "[n]othing presented at the hearing demonstrated an error in the Department's investigation or the Board's determination." (Doc. No. 1-38.) He therefore accepted the recommendation of termination. He also notified Woodard that, "[i]n accordance with Section 3002(g) of the *Employee Handbook*," he had the right to a post-deprivation hearing before a neutral decisionmaker: he could appeal the decision to the City's Disciplinary Review Board ("DRB"). (*Id.*) And, under § 3002 of the *Employee Handbook*, a hearing before the DRB would be conducted pursuant to § 36 of the City Charter, which provided for a full-blown evidentiary hearing in accordance with the Tennessee Uniform Procedures Act, Tenn. Code Ann. §§ 4-5-301 through -319. (Doc. No. 1-7, Employee Handbook § 3002; Doc. No. 1-1, City Charter § 36(d).) The plaintiff did not choose to pursue a post-deprivation hearing and, instead, filed this lawsuit.

The Complaint itself and the exhibits attached to it, which include complete transcripts of both hearings, establish that Woodard was accorded all the process required by *Loudermill* and more: he received two in-person hearings, prior to both of which he had received written notice of the specific nature of the charges and allegations against him; he was represented by counsel at both hearings; and he was permitted to call witnesses, introduce evidence, cross-examine the

witnesses called by the MPD, and testify on his own behalf to present his version of events. *Loudermill* does not require more, especially given that the plaintiff also was given the opportunity to have a full-blown post-termination evidentiary hearing that would have afforded *de novo* review of the decision before a neutral arbiter.

### 3. Whether the Process Accorded Was "Meaningful"

The plaintiff nonetheless argues that he was denied due process because the two hearings were both "sham" proceedings or "Kangaroo courts" at which the outcome was predetermined. (Doc. No. 39, at 40.) He insists that he has alleged sufficient facts in the Complaint for the court to draw the reasonable inference that the hearings were "not . . . fair or neutral" because the outcomes of both hearings were predetermined. (Doc. No. 39, at 41.) He argues that the MPDRB hearing was a "sham" because: (1) it was "initiated by Defendant Atchley's *false* accusations" against him, which Atchley has admitted were based on her intuition, beliefs, and opinions and "subject to her 'editorializing'" (Doc. No. 39, at 40); (2) the MPDRB's stated conclusion that its members were concerned about the plaintiff's "pattern of not being truthful" was demonstrably untrue, because the plaintiff did not have any such pattern; (3) Atchley herself had a pattern and practice of making unfounded accusations against MPD employees, of which her supervisors in the MPD were aware; and (4) the plaintiff did not have a full opportunity to present his side of the story to the MPDRB, because the City failed to notify the witnesses he requested to appear at the MPDRB hearing, thus "forcing Plaintiff to proceed without his witnesses" (*id.* at 41). The plaintiff claims that all of these issues also were present at his hearing before City Manager Tindall. He further claims that the "sham" nature of the second hearing is further demonstrated by: (1) Tindall's refusal even to consider his motion to compel the City to produce Atchley for a deposition; (2) his refusal to hold a "name-clearing hearing," stating only that it was "inappropriate at this stage" (*id.* at 42); (3) Tindall's admission that the hearing before him was not a *de novo*

proceeding, his placement of a time limit on the plaintiff's ability to present evidence and the burden of proof on the plaintiff, and his admission that he had "reviewed all the investigative materials, all information presented to Mr. Woodard as the basis for his discipline, and the advisory decision of the [MPDRB]" prior to the hearing (*id.* at 42); (4) Tindall's referring to Woodard as "Mr." instead of "Officer" Woodard; and (5) Tindall's chastising plaintiff's counsel for "mischaracterizing" the process before him and insisting on "procedural rights that do not exist" and stating that it would not "alter the City's legal defenses moving forward" (*id.* at 42). The plaintiff also argues that his counsel's cross-examination of Atchley clearly demonstrated that she was lying under oath, had made previous false statements, and premised her accusations against the plaintiff on nothing more than intuition and opinion. Finally, when she finished testifying, Atchley winked at Tindall as she was leaving the stand. When plaintiff's counsel protested, Tindall stated that he construed it as simply "a thank you." (Doc. No. 1-37, at 23 (Tr. 84).) In essence, the plaintiff is arguing that any reasonable person who actually considered all the evidence in the record could only have come to the conclusion that Atchley had "fabricated groundless accusations" and that he was innocent of the charges made against him. (Doc. No. 39, at 47.)

Several district court opinions from within this district and at least one circuit court have recognized that, although an unbiased or impartial pretermination hearing is not required, there may be situations in which the "bias is so severe as to interfere with due process at the hearing itself." *Chmielinski v. Massachusetts*, 513 F.3d 309, 318 (1st Cir. 2008); *see id.* ("A key concern in *Loudermill* was that the employee have an opportunity to present his side of things to correct errors of fact on which the termination decision is based. In theory at least, a decisionmaker could be so utterly biased as to deprive an employee of even that error-correction ability." (internal citation omitted)). In *Chmielinski*, the plaintiff alleged that he was deprived of due process because

he was not permitted to perform his own investigation before the hearing; he also claimed that his opportunity to be heard was "meaningless," because the hearing officer was biased, as demonstrated by his having lunch with the opposing attorney on one of the hearing days. The court concluded that these facts, even if true, were not sufficient to establish a deprivation of due process, where the evidence showed that the plaintiff received full notice of the employer's allegations against him months before the hearing, and he appeared at the hearing with counsel and was allowed to present evidence on his own behalf. *Id.* at 317. The court concluded that, even assuming bias on the part of the hearing officer, the complaint did not allege that the purported bias "deprived him of the opportunity to put his version of the facts before the decisionmaker, or that there was any error of primary facts in the grounds used for termination that could be explained only by bias." *Id.* at 318. Although the plaintiff disagreed "with the exercise of judgment which led to the imposed penalty of termination of his employment, . . . that does not state a due process concern arising out of the hearing itself." *Id.*

Closer to home, in *Zavatson v. City of Warren*, 714 F. App'x 512 (6th Cir. 2017), the Sixth Circuit was confronted with the argument that, although the plaintiff had notice of the claims against him and an opportunity to present his side of the story, the disciplinary proceedings against him were a "sham." *Id.* at 527. The plaintiff pointed to two district court cases as examples of cases in which "a pretermination hearing violated an employee's right to due process because 'the bias [against the employee] was so harmful as to totally defeat the concerns and goals of the hearing.'" *Id.* at 528 (quoting *Bettio v. Vill. of Northfield*, 775 F. Supp. 1545, 1564 (N.D. Ohio 1991)). The Sixth Circuit, without actually addressing whether the district court cases were correctly decided, distinguished them from the case before it on the facts, noting that, in the first, the official presiding over the case had been instructed ahead of the hearing to terminate the plaintiff regardless of the

evidence presented at the hearing. *Id.* at 528 (citing *Wagner v. City of Memphis*, 971 F. Supp. 308 (W.D. Tenn. 1997)). And in the second, the plaintiff alleged that the "officials presiding over his pretermination hearing 'knew that the charges [that led to the hearing] were false." *Id.* (citing *Bettio*, 775 F. Supp. at 1564–65).

Even assuming that allegations of extreme bias, without more, may serve to establish a deprivation of due process, this court cannot find the circumstances here similar enough to *Bettio* or *Wagner* to warrant a like outcome. The objective evidence in the record, filed with and referenced in the Complaint, establishes that the decisions based on the hearings conducted on the charges against the plaintiff did not merely "rubber-stamp" Atchley's allegations or accept without modification her view of events, and nothing in the plaintiff's allegations suggests that Atchley or anyone else *knowingly* brought false charges against the plaintiff. Atchley's allegations were investigated independently by Steve Jarrell. His investigation resulted in a conclusion that several of Atchley's allegations were unsubstantiated. Nonetheless, based on his conclusions, the plaintiff's supervisors recommended disciplinary action. The plaintiff appealed, and Jarrell's conclusions were submitted to the MPDRB, which rejected some of his conclusions and accepted others, further narrowing the scope of the charges against the plaintiff but nonetheless concluding, based on the Board members' own view of the evidence presented to them, that the plaintiff had been untruthful.

The court here is not called upon to determine whether it agrees with the MPDRB's decision or whether the decision is supported by a preponderance of evidence in the record. The question is merely whether the decision was reasonable and comported with due process. In that regard, the court finds that, even assuming that the MPDRB's conclusion was in error and not fully supported by the evidence, the plaintiff has not alleged facts that, if true, would establish that the

MPDRB was so biased and the proceedings so tainted as to constitute a sham, thus depriving the plaintiff of a meaningful opportunity to present his side of the story, in violation of *Loudermill*. That hearing, standing alone, was likely sufficient by itself to provide the plaintiff all the predeprivation process to which he was due under the United States Constitution.

Nonetheless, under the Employee Handbook and City Charter, Woodard was also entitled to appeal that decision for a second predeprivation hearing. Although the scope of the City Manager's review was clearly not *de novo*, the record does not reasonably support a conclusion that it constituted a "rubber stamp" of the MPDRB's decision. And, although the hearing was not lengthy or elaborate, it again satisfied *Loudermill*. The plaintiff was notified of the charges against him and provided ample opportunity to prepare. He was permitted to call witnesses, present evidence, cross-examine the City's witnesses, and, most importantly, present his side of the story. In addition, even though the review was not plenary and did not provide the plaintiff with the full scope of discovery he sought, the burden of proof he believed should apply, or the amount of time he believed he needed to fully present his case, the plaintiff had the ability to seek a full, evidentiary, *de novo* review before a neutral hearing officer if he had chosen to appeal the City Manager's decision. He did not.

Regarding the plaintiff's specific arguments, the plaintiff claims that Atchley made her accusations based on belief and intuition, but he does not allege that she intentionally falsified any evidence or that she had a reason to do so. His complaint that he did not have a full opportunity to present his side of the story, based on the City's failure to ensure Whitley's and Eamon's presence at the MPDRB hearing, is groundless for several reasons: (1) the plaintiff waived any objection on that basis by failing to raise it at the hearing and by agreeing to proceed without those witnesses; (2) he has not shown that their testimony would have made a difference; and (3) their absence in

no way hindered him from presenting his side of the story.

His complaints against Tindall are equally meritless. Tindall had no obligation to permit discovery, the filing of pretrial motions, or the submission of proposed findings of fact or conclusions of law, and it was well within his prerogative to review the evidence in the record prior to the hearing. Nor was he required to conduct a *de novo* consideration of the propriety of the recommendation that the plaintiff's employment be terminated. Rather, his only obligation was to comply with the City's established procedures as set forth in the *Employee Handbook* and the City Charter. From the record, it appears that he did so. In any event, the plaintiff does not allege otherwise.

The plaintiff's allegations essentially boil down to a claim that the City got it wrong and that the decisionmakers were biased, but an incorrect personnel decision does not amount to a constitutional violation. As the Supreme Court recognized many years ago, "[t]he Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood*, 426 U.S. 341, 350 (1976). In sum, for purposes of the plaintiff's individual capacity and official capacity claims in Count One, the court finds that, while the Complaint adequately alleges the existence of a protected property right and a deprivation thereof, the allegations in the Complaint coupled with a review of the documentary evidence, all considered in the light most favorable to the plaintiff, do not establish that the deprivation took place in the absence of due process. The process afforded the plaintiff complied with, or exceeded, that required by *Loudermill* and Sixth Circuit precedent construing it. The motions to dismiss Count One will be granted.

### B. Count Two: Deprivation of Liberty Interest Without Due Process

#### 1. The Parties' Arguments

The plaintiff alleges that his reputation, honor, good name, and integrity constitute liberty

interests protected by the Due Process Clause of the Fourteenth Amendment; this interest was violated when Atchley falsely accused him of being dishonest and "publicized her false accusations to numerous individuals"; Atchley violated this interest again when she falsely accused him of criminally impersonating a police officer; the other defendants "intentionally, willfully, knowingly, and in reckless disregard of Plaintiff's constitutional rights accepted and adopted the false . . . and stigmatizing information . . . , publicized the false information to third parties and the public, damaged Plaintiff's name and reputation, and terminated the Plaintiff without due process by [failing to hold] a constitutionally mandated 'name-clearing hearing,'" despite the plaintiff's numerous requests for such a hearing. (Doc. No. 1 ¶¶ 223–25.) He specifically alleges, in the fact section of the Complaint, his belief that a *pre-deprivation* name-clearing hearing is constitutionally required (Doc. No. 1 ¶ 165) and that, despite his "continu[ing] to request a 'Name Clearing Hearing' from Defendant both in writing and verbally, by and through his attorneys," defendant Murfreesboro "steadfast[ly] refused to hold the constitutionally mandated hearing for Plaintiff."

In their Motion to Dismiss, the City Defendants argue that the plaintiff could have pursued a "name-clearing hearing" during the post-deprivation proceedings provided by the City Charter and that, by failing to do so, he waived any claim based on a purported deprivation of a liberty interest in his reputation and good name. (Doc. No. 31, at 13.) For her part, Atchley argues that the plaintiff actually received the name-clearing hearing he requested—in the form of the hearing before City Manager Tindall on August 19, 2019. (Doc. No. 26, at 17.) In response, the plaintiff argues that he was entitled to, and the defendants refused to provide, a "dedicated" pre-termination name-clearing hearing and that he did not waive his right to pursue any such hearing. (Doc. No. 39, at 48.)

2. *The Protection Afforded Liberty Interests*

The law in this particular arena is not well developed, and none of the parties has made much of an effort to assist the court in teasing out its nuances. It is nonetheless clear that, in analyzing a Fourteenth Amendment claim based on the deprivation of a liberty interest, the court must first determine whether a protected "interest exists and then determine what procedures are required to protect that interest." *Crosby v. Univ. of Ky.*, 863 F.3d 545, 552 (6th Cir. 2017). With respect to the first question, a person's interest in his "reputation, good name, honor, and integrity" is among the liberty interests protected by the Due Process Clause of the Fourteenth Amendment. *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002). Further, "[t]hat liberty interest is impugned when a state actor 'stigmatize[s]' an individual by means of 'voluntary, public dissemination of false information' about the individual." *Crosby*, 863 F.3d at 555 (quoting *Quinn*, 293 F.3d at 320). Defamation alone, however, is not enough to invoke due process concerns. *Id.* "[R]ather, the alleged damage must be tied to '[s]ome alteration of a right or status 'previously recognized by state law.'" *Id.* (quoting *Quinn*, 293 F.3d at 319).

The Sixth Circuit has identified five factors a plaintiff must establish to show that he was deprived of a liberty interest and thus entitled to a name-clearing hearing, the first of which is that "[t]he stigmatizing statements must be made in connection with the plaintiff's termination from employment." *Quinn*, 293 F.3d at 320.[7] Once this and the other factors are shown, a "public employer deprives an employee of his liberty interest without due process, if upon request for a name-clearing hearing, the employee is denied." *Id.* (internal quotation marks and citations

---

[7] The others are that the plaintiff must show that he was fired for reasons related to his honesty and integrity and not when the employer "has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance; "the stigmatizing statements or charges must be made public"; "the plaintiff must claim that the charges made against him were false; and "the public dissemination must have been voluntary." *Quinn*, 293 F.3d at 320.

omitted).

This last factor is critical: "A name-clearing hearing is required only if an employer creates a false and defamatory impression about a particular employee *in connection with his termination*." *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989) (emphasis added); *see also Crosby*, 863 F.3d at 555 ("[T]he stigmatizing statements must be made in conjunction with the plaintiff's termination from employment." (quoting *Quinn*, 293 F.3d at 320)); *Ludwig v. Bd. of Trustees*, 123 F.3d 404, 410 (6th Cir. 1997) ("An injury to a person's reputation, good name, honor, or integrity constitutes the deprivation of a liberty interest when the injury occurs in connection with an employee's termination."). Thus, because an actual termination is required before a name-clearing hearing may be warranted, the Sixth Circuit and district courts within the Sixth Circuit have recognized that the time for a name-clearing hearing is *after* an employee's employment has actually been terminated. *See, e.g.*, *Quinn*, 293 F.3d at 320 ("In order to succeed on his liberty interest claim, [plaintiff] must also prove that [defendant] improperly refused to grant him a *post-removal opportunity* to refute the false charges that led to his removal[.]" (quoting *Baden v. Koch*, 799 F.2d 825, 830 (2d Cir. 1986)) (emphasis added)); *Ferencz v. Hairston*, 119 F.3d 1244, 1250 (6th Cir. 1997) ("A name-clearing hearing is required only when a nontenured public employee is dismissed from his or her job . . . ."); *Awrey v. Gilbertson*, No. 10-14242-BC, 2011 WL 2312175, at *4 (E.D. Mich. June 9, 2011) ("It is the denial of a public employee's *postremoval request* for a name-clearing hearing that violates the Due Process Clause; where there is no denial, there is no constitutional violation." (emphasis added)); *see also Carroll v. Knox Cty. Bd. of Educ.* Nos. 3:07-cv-345, 3:08-cv-73, 2010 WL 250704, at *12 (E.D. Tenn. June 17, 2010) (holding that "an employee's liberty interest in a name-clearing hearing is implicated only after he is terminated" and that, because the plaintiff failed to "show[] that she requested a name-clearing hearing post-

removal, she waived her § 1983 claim based upon the deprivation of a liberty interest without due process of law" (citing *Quinn*, 293 F.3d at 320)).

### 3. Whether the Plaintiff Was Denied a Name-Clearing Hearing

Defendant Atchley insists that no particular process is required to accompany a name-clearing hearing and that the plaintiff was accorded all the process to which he was due in the course of his two pre-deprivation hearings. While it is true that a name-clearing hearing "need only provide an opportunity to clear one's name and need not comply with formal procedures to be valid," *Quinn*, 293 F.3d at 321 (internal quotation marks and citations omitted), the Sixth Circuit has also recognized that "a disciplinary hearing is very different from a name-clearing hearing. A name-clearing hearing is not a venue for an employer to determine the proper punishment, but rather an opportunity for an individual to confront a public stigma that *has already been imposed* by an employer." *Gunasekera v. Irwin*, 551 F.3d 461, 469 n.5 (6th Cir. 2009). Further, the Sixth Circuit held in *Gunasekera*, based on the balancing test established by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), that a *public* hearing is required, and it does not appear that either of the hearings accorded the plaintiff was public.

Regardless, and more importantly, the plaintiff does not allege, and the record he submitted does not suggest, that he ever requested a name-clearing hearing *post-termination*. This failure is fatal to his claim. The plaintiff alleges that he made two requests for a name-clearing hearing, one to the City Attorneys and another to the City Manager, both in June 2019, prior to his second hearing and before he had actually been terminated. (*See* Doc. Nos. 1-30, 1-31.) The plaintiff argues that he was entitled to a pre-deprivation name-clearing hearing (Doc. No. 39, at 51), but this is not a correct statement of the law. Although the plaintiff claims that he had already had his reputation and good name impugned by that time, the final decision of whether to terminate his employment remained pending.

The City Defendants argue that the plaintiff was afforded a post-deprivation process that he waived by failing to pursue post-deprivation remedies. This argument hits closer to the mark. As indicated above, the plaintiff was afforded the opportunity for a full-blown, *de novo*, evidentiary hearing post-termination, but he elected to not pursue this opportunity. Regarding this hearing, both the Employee Handbook and the City Charter, attached to the Complaint, cross-reference and adopt the procedures prescribed by the Tennessee Uniform Administrative Procedures Act ("UAPA") in contested cases of termination. In turn, the UAPA requires that hearings that take place thereunder "shall be open to public observation . . . unless otherwise provided by state or federal law." Tenn. Code Ann. § 4-5-312(d). This hearing would have provided the plaintiff with a name-clearing opportunity. By failing to pursue an appeal through the post-termination procedures available to him under the UAPA—or request a "name-clearing hearing" after his termination was officially announced—the plaintiff waived his ability to bring a claim based on a deprivation of a liberty interest.

In addition, the City never denied Woodard's request for a name-clearing hearing. Instead, the City Manager informed him that the request was simply "not appropriate at this stage," that stage being the due process hearing prior to a decision as to whether the plaintiff's employment would, in fact, be terminated. (Doc. No 1-33.) There is no indication that the plaintiff reiterated the request or made any effort to pursue it following his termination—other than by filing this lawsuit. In the Sixth Circuit, a "plaintiff's failure to request a name-clearing hearing [is] fatal to his liberty interest claim." *Quinn*, 293 F.3d at 321; *see also Brown v. City of Niota*, 214 F.3d 718, 723 (6th Cir. 2000) (holding that the plaintiff's liberty interest claim failed because the plaintiff filed suit before his request for a name-clearing hearing was actually denied); *Carroll*, 2010 WL 250704, at *12 (holding that, because the plaintiff failed to "show[] that she requested a name-

clearing hearing post-removal, she waived her § 1983 claim based upon the deprivation of a liberty interest without due process of law (citing *Quinn*, 293 F.3d at 320)).

Based on *Quinn* and *Brown*, this court holds that the plaintiff's requests for a name-clearing hearing before his employment was officially terminated were premature and that, by failing to pursue a post-termination appeal or to reiterate the request after he was terminated, he waived his ability to bring suit based on a violation of his liberty interest. Count Two, against all defendants, is subject to dismissal on this basis.

The court further notes, in the alternative, that Count Two is subject to dismissal insofar as it is asserted against Atchley and Bowen in their individual capacity, because the plaintiff does not allege that he requested a name-clearing hearing from either of them or that they would have been empowered to grant such a request.[8]

### C. Count Three: First Amendment Retaliation Claim

#### 1. *Legal Standards*

For a public employee to establish a *prima facie* case of retaliation in violation of the First Amendment, he must show:

> (1) that [he] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [him] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [his] constitutional rights.

*Boulton v. Swanson*, 795 F.3d 526, 530–31 (6th Cir. 2015) (quoting *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000)).

---

[8] It is unclear whether the plaintiff claims that Atchley's false report that he was impersonating an officer in October 2019, after his termination, also violated his liberty interest in his reputation. If that is part of his claim, it fails because Atchley's false report did not happen "in conjunction with [Woodard's] termination from employment." *Crosby*, 863 F.3d at 555.

The First Amendment, among other things, guarantees both "freedom of speech" (the "Speech Clause") and the right "to petition the Government for a redress of grievances" (the "Petition Clause"). U.S. Const. amend. I. The Supreme Court, in addressing retaliation claims premised on the Speech Clause has held that, in analyzing a public employee's First Amendment retaliation claim, a district court must determine, first, whether the employee spoke (1) as a citizen rather than as a public employee and (2) "on a matter of public concern." *Boulton*, 795 F.3d at 531 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). If both of those questions are answered in the affirmative, the court must then "balance the justifications for a speech restriction against the employee's free speech interest" to determine whether the speech was privileged. *Id.* In the Sixth Circuit, whether a public employee's speech is protected is a question of law. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464 (6th Cir. 2017).

In *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011), the Supreme Court held that the same "framework used to govern Speech Clause claims by public employees" also applies to Petition Clause claims:

> If a public employee petitions *as an employee on a matter of purely private concern*, the employee's First Amendment interest must give way, as it does in speech cases. When a public employee petitions *as a citizen on a matter of public concern*, the employee's First Amendment interest must be balanced against the countervailing interest of the government in the effective and efficient management of its internal affairs. If that balance favors the public employee, the employee's First Amendment claim will be sustained.

*Id.* at 398 (emphasis added; internal citations omitted). In other words, regardless of whether a First Amendment retaliation claim is brought under the Speech Clause or the Petition Clause, the plaintiff must show both that (1) he acted as a private citizen rather than as an employee and (2) his petition concerned a matter of public interest.

### 2. The Parties' Positions

The defendants argue that Woodard's First Amendment retaliation claim is subject to

dismissal simply because the "Complaint establishes that Plaintiff was speaking as an employee on a matter of purely personal interest, not as a citizen on a matter of public concern." (Doc. No. 26, at 19; *accord* Doc. No. 31, at 14 (focusing on public concern element).)[9]

In response, the plaintiff confirms that his claim is brought under the Petition Clause rather than the Speech Clause (Doc. No. 40, at 2), and he argues that the subject of his "petitions" was a matter of public concern, because "any allegations of public officer misconduct or police officers failing to tell the truth are a matter of public concern" (*id.* at 12). He claims that he was a "public employee and a citizen" when he sought review of the proposed termination and that his requests "related to a matter of public concern to address not only the untrue accusations against him by Defendant Atchley, but also to address Defendants' *de facto* policy of 'accepting' and taking actions based upon Defendant Atchley's pattern of baseless and false accusations against others." (Doc. No. 40, at 13 (citing Doc. No. 1 ¶¶ 231–32).) He argues that the defendants caused the disciplinary action against him to become a matter of public concern when they publicized it to third parties and the public. (*Id.* at 16.) He also attempts to characterize his petitions as matters of public concern because he "reported Defendant Atchley's falsehoods because she was a 'rogue cop.'" (*Id.*) Finally, he asserts, as he did in the Complaint, that "Defendant Atchley has a pattern and practice of making false complaints, and Defendants Murfreesboro, Bowen, and Tindall have a pattern and practice of accepting, condoning, and ratifying Defendant Atchley's false accusations." (*Id.*)

---

[9] The defendants also contend that they are entitled to qualified immunity insofar as the claims are asserted against them in their individual capacity. Atchley adds that the plaintiff fails to allege facts showing a causal connection between the plaintiff's termination and his exercise of protected rights. The court does not reach these questions.

### 3. Plaintiff "Petitioned" as a Private Citizen[10]

The Supreme Court has explained that a public employee does not speak "as a citizen" when he "make[s] statements pursuant to [his] official duties." *Garcetti*, 547 U.S. at 421. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22.

In *Lane v. Franks*, 573 U.S. 228, (2014), the Court rejected an expansive reading of *Garcetti*:

> *Garcetti* said nothing about speech that relates to public employment or concerns information learned in the course of public employment. . . . In other words, the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.

*Lane v. Franks*, 573 U.S. 228, 240 (2014). The Sixth Circuit has recognized that, following *Lane*, "the *Garcetti* exception to First Amendment protection for speech [that] 'owes its existence to a public employee's professional responsibilities' must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment." *Boulton*, 795 F.3d at 534. Thus, in *Boulton*, for example, it was "axiomatic that an employee's job responsibilities do not include acting in the capacity of a union member, leader, or official" and, therefore, that "speech in connection with union activities is speech 'as a citizen' for the purposes of the First Amendment." *Id.* at 534. The Sixth Circuit has stressed that the inquiry into whether an individual

---

[10] The parties presume without discussion, for purposes of the Motions to Dismiss, that the plaintiff's internal appeals qualified as "petitions" subject to First Amendment protection, so the court does as well.

spoke as a public employee or as a private citizen "is a practical one," requiring consideration of both the "content and context" of the speech. *Mayhew*, 856 F.3d at 464 (quoting *Garcetti*, 547 U.S. at 424; *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010)).

The court finds that the plaintiff spoke as a public employee and not as a private citizen in this instance. To be clear, the "petitions" allegedly subject to First Amendment protection at issue here appear to be (1) the plaintiff's appeal to Chief Bowen of the initial disciplinary decision, which was actually heard by the MPDRB; (2) the plaintiff's appeal of the MPDRB's decision to City Manager Tindall; and (3) the plaintiff's request for a name-clearing hearing.

Regarding the first "petition," the plaintiff submitted a request for a hearing to review the disciplinary action initially taken by Chief Bowen. (Doc. No. 1-23.) To request a hearing, the plaintiff simply checked a box on the "Disciplinary Action Report (DAR) Form" submitted to him for his signature, stating "I disagree with the final disposition and hereby request a hearing before the Chief and/or Deputy Chief." (Id.) The plaintiff alleges that one of the purposes of his request for a hearing before Bowen was

> to address Defendant Atchley's pattern and practice of trumping up false accusations against other MPD employees, making "mountains out of molehills," "embellishing" complaints about MPD employees, telling "half-truths," giving her "opinions" rather than facts, and Defendant Atchley's spearheading excessive and punitive discipline against Plaintiff and other MPD employees.

(Doc. No. 1 ¶ 111.) However, the plaintiff does not actually allege that he made this purpose or intention known to Bowen or anyone else. Instead, he simply checked a box. Then, because Bowen refused to hear his appeal, the plaintiff "had no option but to appear before the [MPDRB]." (Id. ¶ 112.) The hearing transcript itself does show that plaintiff's counsel cross-examined Atchley and impeached some of her statements, but it does not reflect that Atchley's conduct in other instances involving other officers was a topic of her examination or cross-examination or that it was raised

during the testimony of any of the other witnesses who testified at that hearing. (Doc. No. 1-24.)

In his second "petition," the plaintiff's appeal of the MPDRB's recommendation in the form of the plaintiff's "Motion to Set Aside MPD's Disciplinary Review Board's Recommendation to City Manager Tindall, and Request for New Hearing" (Doc. No. 1-28), the plaintiff took issue with the pre-disciplinary investigation and proceedings before the MPDRB, claiming that he was denied due process and that the MPDRB "ignored evidence" that he presented in his favor, but he did not mention officer Atchley, either expressly or implicitly.

The plaintiff thereafter notified Tindall that he was requesting a "name-clearing hearing" to refute Atchley's "incorrect[] accus[ations] . . . of dishonesty and violation of the MPD Code of Conduct." (Doc. No. 1-31; *see also* Doc. No. 1-30 (email notifying City attorney that he requested name-clearing hearing.) While this "petition" does mention Atchley, the plaintiff does not indicate that he is attempting to vindicate anyone's rights or good name other than his own.

All of these purported "petitions" were in response to a disciplinary action against the plaintiff. The first two were submitted in accordance with internal procedural rules governing disciplinary action against City employees, set forth in the excerpts of the Employee Handbook attached to the Complaint. As such, although his requests for hearings were not submitted in the ordinary course of his day-to-day activities, they were made in his capacity as a police officer for the City, in accordance with established procedures. The appeals themselves are not alleged to have been made public, and appeals of this type are not "the kind of activity engaged in by citizens who do not work for the government." *Garcetti*, 547 U.S. at 423. *Accord Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544 (6th Cir. 2007) (statements made by park employee in a conversation with an outside consultant were not made in his capacity as a private citizen where, although it was not among his ordinary daily duties, the conversation constituted an "'ad-hoc' duty that arose

in the course of [his] employment"). The plaintiff's appeals "were directly related to [his] alleged job responsibilities," *Handy-Clay v. City of Memphis*, 695 F.3d 531, 541 (6th Cir. 2012), and the plaintiff did not go outside the chain of command to bring them, *see Fox*, 605 F.3d. at 350 ("[W]hen a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." (citation omitted)). Likewise, although the request for a name-clearing hearing was not, as required, submitted after the termination decision had become final, it was nonetheless submitted in the plaintiff's capacity as a police officer challenging a disciplinary decision.

The content of the petitions likewise does not lend support to a conclusion that they were made in the plaintiff's capacity as a private citizen. The first "petition," as indicated above, consists of nothing more than a Disciplinary Action Report (DAR) Form With Employee Signature, with the City of Murfreesboro's emblem and the MPD's address in the caption at the top of the form. (Doc. No. 23-1.) The plaintiff checked a box and signed this form in his capacity as "employee" on the line for "Employee's Signature," below which appears his "Supervisor's Signature." (*Id.*) His intentions aside, nothing about this form suggests that he signed it as anything other than an employee of the City of Murfreesboro.

The "Motion to Set Aside [the MPDRB's] Recommendation to City Manager Tindall, and Request for New Hearing" (Doc. No. 1-28) and the request for a name-clearing hearing similarly address the disciplinary action against the plaintiff and his contentions that the recommended termination was unwarranted and unsupported by the evidence and that the procedure followed did not accord with due process. Again, they do not suggest that the plaintiff was petitioning as a private citizen. Rather, he was contesting the proposed termination of his public employment.

Based on the content and context of the purported petitions and the entirety of the

circumstances alleged by the plaintiff, the court concludes that the plaintiff's petitions were made in his capacity as a public employee and not as a private citizen and, therefore, are not entitled to First Amendment protection.

### 4.   The Petitions Did Not Address a Matter of Public Concern

Because the plaintiff's purported petitions were not made in his capacity as a private citizen, his First Amendment claim fails. Additionally and alternatively, the court also finds that they did not concern a matter of public concern, which also dooms the claim.

Whether a petition (or speech) addressed a matter of public concern likewise "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 140–41 (1983). The Sixth Circuit has emphasized that the courts should determine "the *point* of the speech in question." *Boulton*, 795 F.3d at 534 (quoting *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1187 (6th Cir. 1995)). In the context of personnel disputes, the court has recognized that, "[a]lthough government effectiveness and efficiency could generally be considered a matter of public concern, . . . assertions of incompetence and poor management decision-making [are typically] run-of-the-mill employment disputes—particularly when the recommended course of action would benefit the employee." *Boulton*, 795 F.3d at 532 (citations omitted). On the other hand, speech that "alleges corruption and misuse of public funds, failure to follow state law, major state policy decisions, or discrimination of some form" has been found to address matters of public concern. *Id.* (internal citations omitted). More broadly, the Supreme Court has recognized that "[s]peech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241.

In this case, the plaintiff broadly asserts that "any allegations of public officer misconduct

or police officers failing to tell the truth are a matter of public concern." (Doc. No. 40, at 12.) While, under certain circumstances at least, allegations of police brutality, the use of excessive force, the misuse of public funds, dishonesty while testifying in court, and other similarly egregious allegations might qualify as matters of public concern, if every instance of police officer misconduct were a matter of public concern, then every time a police officer is fired for cause he would have the ability to claim that his appeal of that decision constituted a matter of public concern. Moreover, while claims against a police officer for untruthfulness might, under some circumstances, be matters of public concern, allegations that a police officer was untruthful during the course of an investigation into a relatively minor incident unrelated to his treatment of any member of the public does not rise to that level.

The plaintiff claims that he submitted his appeals to address, not only the accusations that he had been untruthful, "but also . . . Defendants' *de facto* policy of 'accepting' and taking actions based upon Defendant Atchley's pattern of baseless and false accusations against others." (Doc. No. 40, at 13 (citing Doc. No. 1 ¶¶ 231–32).) While this may have been the plaintiff's intention, as indicated above, that intention is not anywhere reflected in the actual "petitions" to address his grievances. The plaintiff's secret motive is simply irrelevant; the question is whether his actual petition concerned a matter of public concern.

The plaintiff also claims that the matter became one of public concern because the defendants publicized it. The defendants, however, did not publicize the plaintiff's petitions or his claims. They publicized the fact that he had been disciplined and the basis for the disciplinary action. Regardless of whether such publication was warranted, it did not serve to make the plaintiff's First Amendment petitions themselves matters of public concern.

Finally, the plaintiff insists that he "reported Defendant Atchley's falsehoods because she

was a 'rogue cop'" and that "Defendant Atchley has a pattern and practice of making false complaints, and Defendants Murfreesboro, Bowen, and Tindall have a pattern and practice of accepting, condoning, and ratifying Defendant Atchley's false accusations." (Doc. No. 40, at 16.) The plaintiff makes the latter assertion in the Complaint as well, but, again, there is no indication in the Complaint, the hearing transcripts, or the other exhibits that he actually made these claims *to the defendants* at any time during the underlying proceedings. Thus, to the extent the plaintiff seeks to extend First Amendment protection to the *speech* in which he engaged during the disciplinary proceedings, or to characterize speech made during these proceedings as part of the petitioning process, the effort cannot succeed. The fact that the plaintiff makes those allegations now, in his Complaint and his Responses to the defendants' motions, is immaterial to his retaliation claims and cannot serve retroactively to establish that the speech and petitions at issue addressed matters of public concern.

In sum, the plaintiff's petitions and speech in this case were solely directed to his direct supervisors in response to disciplinary action taken against him while he was employed by the MPD. They were made by him in his capacity as a public employee and they addressed solely matters of private concern—the disciplinary action recommended to be taken against him arising from both his conduct at a traffic stop during the course of his duties and his responses to an investigation of that conduct. The petitions (and speech) at issue, as alleged in the Complaint and clearly shown from the attached exhibits, are not entitled to First Amendment protection, so the plaintiff's First Amendment retaliation claim must be dismissed as a matter of law for failure to state a claim for which relief may be granted.

## V.  OTHER CLAIMS FOR RELIEF

Because the court has determined that the plaintiff has failed to allege facts showing that his constitutional rights under the First or Fourteenth Amendment have been violated, he is not

entitled to relief on Counts One, Two, or Three of the Complaint. Moreover, his claims for injunctive relief (Count Four) and punitive damages (Count Five) are rendered moot by the conclusion that he has failed to make out a *prima facie* case of a constitutional violation. These claims, too, are subject to dismissal, and the plaintiff's pending Motion for Preliminary Injunction (Doc. No. 20) is also rendered moot.

## VI.     CONCLUSION

The plaintiff presents a compelling case that he was treated unfairly and that his termination was unwarranted, but the fairness of the decisions made by the City of Murfreesboro and Chief Bowen is not at issue. Rather, the question is whether the defendants violated the plaintiff's constitutional rights under the Fourteenth and First Amendments. The record here—which is much more extensive than is typical at this stage in the proceedings—viewed in the light most favorable to the plaintiff, fails to suggest that they did.

For the reasons set forth herein, the defendants' Motions to Dismiss will be granted. The Complaint will be dismissed in its entirety, with prejudice, and all other pending motions will be denied as moot. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge